UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH WAYNE PRICE,<br><br>Plaintiff,<br><br>v.<br><br>TAMALPAIS UNION HIGH SCHOOL DISTRICT, et al.,<br><br>Defendants. | Case No. 24-cv-08033-JSC<br><br>**ORDER RE: MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Re: Dkt. No. 30 |

Plaintiff sues Tamalpais Union High School District ("TUHSD"), Tamalpais High School ("Tam High") Principal Kimberly Clissold, and TUHSD Superintendent Dr. Tara Taupier for injuries suffered while working as a Campus Supervisor at Tam High. (Dkt. No. 20.) The Court previously granted TUHSD's motion to dismiss and gave Plaintiff leave to amend to add new claims and defendants. (Dkt. No. 19.) Now pending before the Court is Defendants' motion to dismiss Plaintiff's amended complaint. (Dkt. No. 30.) Having carefully considered the parties' submissions, and with the benefit of oral argument on October 16, 2025 and supplemental briefing, the Court determines further oral argument is not required, *see* N.D. Cal. Civ. L.R. 7-1(b), VACATES the December 18, 2025 hearing, and GRANTS Defendants' motion to dismiss. Plaintiff's Section 1983 claims fail because he has not alleged the individual defendants acted affirmatively to create or expose him to a danger he would not otherwise have faced, or took adverse employment action against him, and because qualified immunity protects the individual defendants from damages liability.

**BACKGROUND**

**I.   AMENDED COMPLAINT ALLEGATIONS**

For decades, Tam High has had "many serious and troubling issues with racial

segregation," including "well-documented instances of racial issues" and "[r]acial profiling, stereotypes, and discrimination against Black students." (Dkt. No. 20 ¶ 26.) In the 2023-2024 school year, only 57 students—or 3.7% of Tam High's student body—identified as Black or African American. (*Id.* ¶ 25.)

Tam High hired Plaintiff, a Black man, as a Campus Supervisor in 2017. (*Id.* ¶ 3.) The Campus Supervisor role includes "enforcing school and District rules regarding student behavior, supporting teachers and administrators, mediating and managing student conflicts, patrolling the school grounds to observe, reporting and intervening in situations that are dangerous or involve rule violations, and encouraging positive student behavior through daily engagement and communication." (*Id.* ¶ 40.) Plaintiff was therefore "responsible for supervising the campus and for helping to provide a safe and secure environment for students and staff." (*Id.*)

Around August 26, 2023, a group of white Tam High students recorded a video containing repeated use of the N-word. (*Id.* ¶ 48.) The video was shared in a message chat group with 13 recipients, likely Tam High students, and word spread "among Tam High's white student body." (*Id.* ¶¶ 49-50.) A student upset about the video eventually notified a Tam High staff member, and around September 20, 2023, the Tam High Dean of Students initiated an investigation and discussed the video with two Tam High Assistant Principals. (*Id.* ¶¶ 50-51.) These employees informed Principal Clissold and "numerous white administrators," including Tam High's Assistant Principal, Tam High's Senior Director of Student Services, TUHSD's Assistant Superintendent of Educational Services, TUHSD's Superintendent Taupier, and the TUHSD Board of Trustees. (*Id.* ¶¶ 52-53.) Plaintiff alleges Defendants "informed the school's administrative leadership and teachers—all or nearly all of them white people," but "Black staff members at Tam High, including [Plaintiff], were not informed about the situation." (*Id.* ¶ 53 (emphasis omitted).)

On September 29, 2023, Principal Clissold sent a message to Tam High students' families regarding the school's investigation into the video. (*Id.* ¶ 55.) Defendants "did not share the September 29 message (or any other communication about the racist video and resulting tensions on campus) with Black Tam High staff members," and Plaintiff "did not receive or see the September 29 message," but "white Tam High staff did receive" it. (*Id.* ¶¶ 55-57 (emphasis

2

1    omitted)).) Although the September 29 message was "extremely vague," and only explained the
2    school's awareness of the video, "[m]ultiple white staff members received far more detailed
3    information" about the substance of the video and the students involved, or saw the video itself.
4    (*Id.* ¶ 60.) Principal Clissold and Superintendent Taupier "engaged in communications with white
5    staff members about the situation, but took no steps to inform Black staff members like
6    [Plaintiff]." (*Id.*) Superintendent Taupier also informed the TUHSD Board of Trustees about the
7    video and investigation. (*Id.* ¶ 59.)
8        On October 2, 2023, at least three students received "school consequences" related to the
9    video. (*Id.* ¶ 62). Throughout the week, "racial tensions and upset persisted and metastasized
10   among Tam High students." (*Id.*). On October 6, 2023, Plaintiff "received an on-the-job call from
11   a Tam High administrator or office staff member directing him to go to a campus restroom where
12   students were lingering after a class period had begun." (*Id.* ¶ 64.) When Plaintiff called for the
13   students to come out of the restroom, a white student and two Black students left the restroom,
14   another white student exited and yelled something at the Black students, and a physical altercation
15   erupted. (*Id.* ¶ 65.) Plaintiff "leapt into action to try to defuse the in-progress fight," but he was
16   "inadvertently struck at least twice while trying to separate the students," and felt a "sudden, sharp,
17   searing pain in his left arm and shoulder." (*Id.* ¶ 66.) If Defendants had informed Plaintiff of the
18   "racist video and resulting racial tensions on campus," Plaintiff "would have used his experience
19   and training to defuse the situation and would have taken proactive steps to protect the safety of
20   himself and the students present." (*Id.* ¶ 67). Plaintiff also "would have used his training, skills,
21   and relationships . . . to defuse racial tensions and the risk of violence well before" the altercation.
22   (*Id.* ¶ 68.)
23       Plaintiff later learned the altercation "stemmed from racial tensions that had been
24   heightened due to the racist video" and "followed a charged verbal exchange between the Black
25   and white students that included reference to the video." (*Id.* ¶ 72.) One student involved told
26   Plaintiff the "racist video was the driving force of the October 6 altercation." (*Id.* ¶ 86). In
27   addition, on December 5, 2023, Superintendent Taupier sent an email acknowledging "Black staff
28   members were not informed about the video at the time of [the] administration's awareness." (*Id.*

¶ 82.)

Plaintiff has been unable to work for more than twelve months due to persistent "severe pain in his left arm and shoulder area." (*Id.* ¶ 83.) Although he underwent surgery, he will require further medical treatment, and his injuries might prevent him from ever working again. (*Id.* ¶¶ 83, 84, 87.) Plaintiff also suffered "emotional and psychological harm," including "nightmares, difficulty sleeping, and extreme anxiety and distress," due to distance from students, difficulties parenting due to his injuries, and Defendants' discriminatory conduct. (*Id.* ¶¶ 85, 88-90).

## II. PROCEDURAL HISTORY

Plaintiff sued TUHSD alleging violations of the Due Process and Equal Protection Clauses under 42 U.S.C. § 1983; discrimination and failure to prevent discrimination in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940; and fraudulent concealment. (Dkt. No. 1.) TUHSD moved to dismiss. (Dkt. No. 11.) The Court granted TUHSD's motion because the Eleventh Amendment barred the section 1983 claims against TUHSD, and the Court declined to exercise supplemental jurisdiction over the state law claims. (Dkt. No. 19.) However, the Court granted Plaintiff leave to amend to add new defendants and claims. (*Id.*) Plaintiff filed an amended complaint suing Tam High Principal Kimberly Clissold and TUHSD Superintendent Tara Taupier for violations of the Due Process and Equal Protection Clauses under section 1983, and TUHSD for discrimination and failure to prevent discrimination in violation of FEHA and fraudulent concealment. (Dkt. No. 20.) His amended complaint seeks damages and injunctive and declaratory relief, including court orders requiring Defendants to provide necessary and equal information related to staff safety. (*Id.* at 26.) Defendants now move to dismiss Plaintiff's amended complaint. (Dkt. No. 30.)

## DISCUSSION

## I. SECTION 1983 FEDERAL CLAIMS AGAINST INDIVIDUAL DEFENDANTS

### A. State-Created Danger Claim

#### 1. Constitutional Violation

"[A]lthough the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action 'affirmatively place[s]

4

the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Serv.*, 489 U.S. 189, 197 (1989)). Under the state-created danger doctrine, "the state may be constitutionally required to protect a plaintiff that it affirmatively places in danger by acting with deliberate indifference to a known or obvious danger." *Sinclair v. City of Seattle*, 61 F.4th 674, 680 (9th Cir. 2023) (quotation marks and citation omitted), *cert. denied*, 144 S. Ct. 88 (2023). "To succeed on a state-created danger claim, a plaintiff must establish that (1) a state actor's affirmative actions created or exposed him to an actual, particularized danger that he would not otherwise have faced, (2) that the injury he suffered was foreseeable, and (3) that the state actor was deliberately indifferent to the known danger." *Id.* (cleaned up).

As to the state actor's affirmative actions, "[t]he critical distinction is not . . . an indeterminate line between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk." *Kennedy*, 439 F.3d at 1063 n.4 (quotation marks and citation omitted); *see also DeShaney*, 489 U.S. at 203 (rejecting state-created danger claim when state actors "stood by and did nothing when suspicious circumstances dictated a more active role"); *Johnson v. City of Seattle*, 474 F.3d 634, 641 (9th Cir. 2007) (rejecting state-created danger claim because state actors placed plaintiffs "in no worse position than that in which they would have been had the Defendants not acted at all" (cleaned up)).

Plaintiff's claim fails because he does not allege Principal Clissold's and Superintendent Taupier's affirmative actions, as opposed to their inaction, created or exposed him to a danger he would not otherwise have faced. Plaintiff alleges Principal Clissold and Superintendent Taupier selectively shared information about the racist video and resulting racial tensions on campus with white staff. The individual Defendants' affirmative acts include Principal Clissold's September 29 message to students' families, Superintendent Taupier's informing the TUHSD Board, and additional communications with white staff. However, Plaintiff does not allege any of these affirmative acts created or increased dangers he faced. Instead, Plaintiff alleges the individual defendants' *failure* to inform *him* about the "racist video and resulting racial tensions on campus"

prevented him from safely responding to the altercation. (*Id.* ¶ 67.) Although there is a world in which Defendants' affirmative communications about the video might have sparked or exacerbated the October 6 altercation, Plaintiff instead alleges the "racist video was the driving force" of the altercation which injured him. (*Id.* ¶ 86.) So, because Plaintiff alleges the individual Defendants' inaction, rather than affirmative action, created or exposed him to danger, he does not plead a state-created danger claim. *See Wormuth v. Lammersville Union Sch. Dist.*, 305 F. Supp. 3d 1108, 1122 (E.D. Cal. 2018) (rejecting state-created danger claim because principal's failure to supervise teacher or change student's class was "passive inaction as [opposed to] action that is affirmative"); *cf. Shen v. Albany Unified Sch. Dist.*, 436 F. Supp. 3d 1305, 1312 (N.D. Cal. 2020) (allowing state-created danger claim because superintendent's message "exacerbate[d] the possibility of harm" to the plaintiff).

    For this reason, the Court is not persuaded by Plaintiff's reliance on *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006), to argue "the *withholding* of critical information impacting a person's safety" can be the affirmative act underlying a state-created danger claim. (Dkt. No. 37 at 9.) In *Kennedy*, Ridgefield Police Department Officer Shields responded to Kimberly Kennedy's report Michael Burns had molested her daughter and "assured Kennedy that she would be given notice prior to any police contact with the Burns family about her allegations." *See Kennedy*, 439 F.3d at 1057-58. But instead, Officer Shields informed Angela Burns of Ms. Kennedy's allegations, and—that same night—Mr. Burns broke into Ms. Kennedy's home and shot her while she was sleeping. *Id.* at 1058. In evaluating Ms. Kennedy's state-created danger claim, the Ninth Circuit explained Officer Shields "affirmatively created a danger to Kennedy she otherwise would not have faced" because he "drove to the Burns residence and notified the Burns family of the allegations against Michael." *Id.* at 1063. So, although Officer Shields might have limited the danger he created by notifying Ms. Kennedy, the affirmative action underlying her claim was his informing the Burns family, not his failure to notify. Like in *Kennedy*, Plaintiff argues individual Defendants exacerbated the danger he faced by failing to notify him, but unlike in *Kennedy*, Plaintiff does not assert an affirmative action which created the danger to begin with.

    Instead, Plaintiff's claim is similar to the plaintiffs' claims in *Johnson v. City of Seattle*,

6

474 F.3d 634 (9th Cir. 2007). The *Johnson* plaintiffs, injured by a crowd at Pioneer Square, sued the Seattle mayor and police chief for their decision to "deter unlawful activity by maintaining a strong presence of uniformed officers" at the crowd's perimeter, rather than actively engaging in the crowd. *Id.* at 635-37. Rejecting the plaintiffs' state-created danger claim, the Ninth Circuit explained the defendants' decision to adopt a more passive plan "was not affirmative conduct that placed the [] Plaintiffs in danger, because it did not place them in any worse position than they would have been in had the police not come up with any operational plan whatsoever." *Id.* at 641. Like the *Johnson* defendants' passive plan, Defendants' communications to individuals besides Plaintiff did not place Plaintiff in a worse position than if Defendants had not communicated about the racist video to anyone.

        The workplace safety cases Plaintiff cites are also unavailing because the employers in those cases affirmatively acted to create a danger for the employee. *See Pauluk v. Savage*, 836 F.3d 1117, 1125 (9th Cir. 2016) (employer involuntarily transferred employee to facility where he was exposed to toxic mold); *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (employer assigned inmate convicted of violent sex offenses to work alone with employee). Because Plaintiff does not include facts to plausibly allege the individual Defendants' actions, as opposed to inaction, increased Plaintiff's risk to danger, Plaintiff has not pled a state-created danger claim.

        The resulting danger, however, may be actual and particularized. Defendants rely on *Sinclair v. City of Seattle*, 61 F.4th 674 (9th Cir. 2023), in which the Ninth Circuit held Seattle, by removing police from a city zone, created "a generalized danger experienced by all those members of the public who chose to visit the [] zone," rather than a specific danger to the plaintiff. *Id.* at 683. While the Ninth Circuit explained a particularized danger must be "of, relating to, or being a single person or thing," it refused to resolve the "open question" whether the danger needed to be "particularized to a specific, known individual." *See id.* at 682-84 (cleaned up). Unlike the *Sinclair* plaintiff, who was an "undifferentiated member of the public," *id.* at 683, Plaintiff's "*core* job responsibility was to address student conflicts and keep the campus community safe," so he faced particular risks if student conflicts emerged on Tam High's campus. (Dkt. No. 20 ¶ 55 (emphasis in original).) So, in light of *Sinclair*'s refusal to require a danger particularized to a

7

1    "specific, known individual," Defendants' argument Principal Clissold and Superintendent
2    Taupier did not specifically know about the risk of a student fight injuring Plaintiff is not
3    dispositive. *Sinclair*, 61 F.4th at 683.
4    Defendants also argue Plaintiff has not alleged Principal Clissold's and Superintendent
5    Taupier's deliberate indifference. Deliberate indifference is a "stringent standard of fault" which
6    requires a defendant "recognize the unreasonable risk and actually intend to expose the plaintiff to
7    such risks without regard to the consequences." *Id.* at 680 (cleaned up). In *Sinclair*, the Ninth
8    Circuit found the police department deliberately indifferent because it was "self-evident" its
9    abandonment of a city precinct "would create a toxic brew of criminality that would endanger City
10   residents." *Id.* at 681. Here, Plaintiff argues Tam High's history of racial issues and tensions on
11   campus after the video "created a powder keg situation that Defendants were wholly aware of,"
12   making the altercation injuring Plaintiff similarly self-evident. (Dkt. No. 31 at 15.) Because
13   "[t]he deliberate-indifference inquiry should go to the jury if any rational factfinder could find this
14   requisite mental state," the Court will not dismiss Plaintiff's claim for failure to allege deliberate
15   indifference. *See Murguia v. Langdon*, 61 F.4th 1096, 1111 (9th Cir. 2023) (quotation marks and
16   citation omitted), *cert. denied sub nom.*, *Tulare v. Murguia,* 144 S. Ct. 553 (2024).
17   However, because Plaintiff alleges Principal Clissold's and Superintendent Taupier's
18   inaction, rather than affirmative acts, created or exposed him to danger, Plaintiff has not stated a
19   state-created danger claim. So, the Court dismisses Plaintiff's section 1983 Due Process claim.

### 2. Qualified Immunity

21   Because in a footnote to their reply brief, Defendants argued the cases Plaintiffs rely on
22   "heavily impl[y] that the right was not 'clearly established' providing Defendants a qualified
23   immunity defense," (Dkt. No. 33 at 11 n.1), the Court ordered supplemental briefing on whether—
24   even if Plaintiff can plausibly allege constitutional violations—the individual Defendants are
25   entitled to qualified immunity.
26   The Supreme Court has "repeatedly [] stressed the importance of resolving immunity
27   questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)
28   (citations omitted). However, "[d]etermining claims of qualified immunity at the motion-to-

8

dismiss stage raises special problems for legal decision making." *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018) (citation omitted). "At the motion to dismiss stage, 'dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies.'" *Polanco v. Diaz*, 76 F.4th 918, 925 (9th Cir. 2023) (quoting *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016)). Specifically, "[d]etermining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *O'Brien*, 818 F.3d at 936 (quotation marks and citation omitted); *see also Keates*, 883 F.3d at 1235 (explaining courts "consider whether the complaint alleges sufficient facts, taken as true, to support the claim that the officials' conduct violated clearly established constitutional rights of which a reasonable officer would be aware 'in light of the specific context of the case.'" (citation omitted)). "If the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then plaintiffs are entitled to go forward with their claims." *Keates*, 883 F.3d at 1235 (quotation marks and citation omitted).

At a high level, "the law [is] clearly established that officers may be liable when they affirmatively place an individual in danger." *Kennedy*, 439 F.3d at 1066. But "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation omitted). Instead, "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he was doing violates that right." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017) (quotation marks and citation omitted).

To show clearly established law, Plaintiff primarily relies on *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992); *Pauluk v. Savage*, 836 F.3d 1117 (9th Cir. 2016); and *Polanco v. Diaz*, 76 F.4th 918 (9th Cir. 2023). In each of these cases, an employee sued their employer for dangers encountered in their workplaces. However, unlike in Plaintiff's case, the employers in these cases affirmatively acted to make their employees' jobs more dangerous. For example, the *Pauluk* plaintiff's employer transferred him to a facility with mold, and the plaintiff's exposure to mold in

9

that facility allegedly caused his death. *See Pauluk*, 836 F.3d at 1119; *see also id.* at 1125 ("Pauluk's 2003 transfer back to [the facility] was 'affirmative' conduct."). And in *Grubbs* and *Polanco*, the plaintiffs' employers put them in contact with dangerous individuals or conditions, which led to their injuries. *See Grubbs*, 974 F.2d at 121-22 (explaining defendants "knowingly assigned" a violent sex offender to work alone with the plaintiff, which "created the opportunity for and facilitated [his] assault" on the plaintiff); *Polanco*, 76 F.4th at 924, 926 (explaining defendants "transferred inmates from a prison experiencing an active COVID-19 outbreak to a prison" where the plaintiff was a guard whose duties included "driv[ing] sick inmates—including those with COVID-19—to local hospitals").

So, in each of these three cases, the defendant-employers either assigned the plaintiff-employees to a more dangerous job or incorporated more dangerous conditions into the plaintiffs' existing jobs. In contrast, Principal Clissold and Superintendent Taupier did neither. Unlike in *Pauluk*, Plaintiff alleges he remained in his position as Campus Supervisor, not that the individual Defendants changed his job responsibilities. And unlike in *Grubbs* and *Polanco*, Plaintiff does not allege the individual Defendants made the conditions of his employment more dangerous; instead, he argues racial tensions on campus made his job more dangerous, and the individual Defendants failed to alleviate those dangers by informing him about them. So, *Pauluk*, *Grubbs*, and *Polanco* are not sufficient to put a reasonable officer on notice their mere withholding of information from Plaintiff could violate his constitutional rights.

Plaintiff also relies on *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006). As an initial matter, *Kennedy*'s law enforcement context is different from the workplace context for qualified immunity purposes in state-created danger claims. *See Pauluk*, 836 F.3d at 1125-26 ("Because *Wood* did not involve a dangerous workplace, it does not speak to this question."); *cf. Audrey G. v. City of Lafayette*, No. 21-CV-03545-WHO, 2022 WL 2528599, at *8 (N.D. Cal. July 7, 2022) (explaining, based on *Kennedy*, "police officers have been aware that [the state-created danger] doctrine applies to their actions"). However, for the same reason *Kennedy* does not support Defendants' violation of Plaintiff's constitutional rights, it does not show Defendants violated clearly established rights. While "[m]ishandling and omitting critical information is a

10

thread running through *Kennedy*," (Dkt. No. 39 at 9), the *Kennedy* plaintiff had a state-created danger claim because the officer affirmatively shared information with a third-party, not because the officer did not provide information to the plaintiff. So, *Kennedy* does not clearly establish the withholding of information can support a state-created danger claim.

Finally, Plaintiff cites *Shen v. Albany Unified School District*, 436 F. Supp. 3d 1305 (N.D. Cal. 2020). In *Shen*, the school superintendent disseminated a message about a suspected noose, which the plaintiff argued caused violence among students and led to his injuries. *See id.* at 1311-12. However, unlike the *Shen* plaintiff, Plaintiff does not allege Defendants' communications increased violence on campus or otherwise exposed Plaintiff to a greater risk of danger. Even if *Shen* sufficed as clearly established law, it would not be analogous to Plaintiff's claim, which is based on inaction, rather than action.

Plaintiff does not allege any facts under which Superintendent Taupier's or Principal Clissold's conduct in withholding information from Plaintiff would violate clearly established rights of which a reasonable officer would be aware. So, even if Plaintiff's allegations amounted to a plausibly alleged state-created danger claim, the individual Defendants would be entitled to qualified immunity on the claim.

### B. Equal Protection Claim

#### 1. Constitutional Violation

The Equal Protection Clause of the Fourteenth Amendment provides no state actor shall "deny to any person within its jurisdiction the equal protection of the laws" and therefore requires state actors "to treat all similarly situated people equally." *See Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008). To state a 42 U.S.C. § 1983 claim for an Equal Protection Clause violation, a plaintiff may show "a discriminatory reason more likely than not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022) (cleaned up); *see also Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) ("[A] plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." (quotation marks and citation omitted)).

In the employment context, "a plaintiff may make out a prima facie case of discrimination by demonstrating that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she experienced an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably." *Ballou*, 29 F.4th at 422 (quotation marks and citation omitted) (applying *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). "[A]n adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of . . . employment.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (citation omitted). "Adverse employment actions include 'assigning more, or more burdensome, work responsibilities' as well as 'termination, demotion, failing to promote, denial of an available job, adverse job assignments, official discipline, and significant changes in compensation or benefits.'" *Martinez v. Costco Wholesale Corp.*, 481 F. Supp. 3d 1076, 1091 (S.D. Cal. 2020) (citing *Davis*, 520 F.3d at 1089; *Ayala v. Frito Lay, Inc.*, 263 F. Supp. 3d 891, 905 (E.D. Cal. 2017)). "'Mere ostracism' or minor conduct, however, does not constitute an adverse employment action." *Id.* (citing *Davis*, 520 F.3d at 1089).

Although Plaintiff alleges the individual defendants "took adverse employment action against [him] because of [his] race," he has not stated facts to plausibly allege Superintendent Taupier's or Principal Clissold's withholding of information constituted an adverse employment action. (Dkt. No. 20 ¶ 136.) As an initial matter, Plaintiff has not cited any cases in which a court has found withholding of information alone materially affected the terms of employment and constituted an adverse employment action. In *Davis v. Team Electric Co.*, 520 F.3d 1080 (9th Cir. 2008), the Ninth Circuit held an employee consistently excluded from workplace spaces and radio communications and given discriminatory work assignments had shown a material effect on the terms and conditions of her employment. *See id.* at 1090. However, the Ninth Circuit did not decide whether exclusion from important workplace communications alone would suffice as an adverse employment action. *See id.*; *see also Wasche v. Orchard Hosp.*, No. 2:18-CV-02246-MCE-DB, 2020 WL 4923710, at *6 (E.D. Cal. Aug. 21, 2020) (withholding resources necessary to do one's job, alongside denial of pay and job status and termination, constituted adverse employment action).

Furthermore, Plaintiff alleges Defendants' withholding of information prevented him from "us[ing] his experience and training to defuse the situation," "tak[ing] proactive steps to protect the safety of himself and the students present," and "defus[ing] racial tensions and the risk of violence" before the altercation occurred. (Dkt. No. 20 ¶¶ 67-68.) Plaintiff has not, however, alleged facts to plausibly allege the specifically withheld information about the racist video and racial tensions on campus was *necessary* for him to safely defuse the fight. Without alleging the withheld information was necessary to safely perform his job, Plaintiff has not pled Defendants' actions materially affected the terms or conditions of his employment and therefore constituted an adverse employment action.

Plaintiff instead argues Defendants' withholding information "placed him in danger and caused his harm," and the resulting harm "'materially affected the compensation, terms, conditions, or privileges' of his employment" because he became unable to work. (Dkt. No. 31 at 23.) However, the student altercation, rather than Defendants' withholding of information, caused the harm which prevented Plaintiff from working. As noted above, Plaintiff alleges the student altercation arose from the racist video itself, rather than Defendants' failure to inform him about it. So, although Plaintiff alleges if Defendants had communicated with him, he would have "taken proactive steps to protect [his] safety," (Dkt. No. 20 ¶ 67), he has not included facts to plausibly allege Defendants' withholding of information actually caused his harm and therefore materially affected the terms of his employment to constitute an adverse employment action.

Because Plaintiff has not stated facts to plausibly allege Principal Clissold and Superintendent Taupier took adverse employment action against him, the Court dismisses Plaintiff's Equal Protection Claim under Section 1983.

### 2. Qualified Immunity

"[T]here doesn't need to be a prior case with materially similar facts in order for a right to be clearly established. . . . This is especially true in equal protection cases because the non-discrimination principle is so clear." *Elliot-Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010); *see also Flores v. Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980) ("The constitutional right to be free from such invidious discrimination is so well established and so essential to the

preservation of our constitutional order that all public officials must be charged with knowledge of it."). Still, "existing case law must have put 'every reasonable official' on notice that their conduct was unconstitutional." *Martinez v. High*, 91 F.4th 1022, 1031 (9th Cir. 2024) (citation omitted). And here, Plaintiff cites no case law supporting an inference every reasonable official would have been on notice their withholding of information on the basis of race could constitute an adverse employment action, and, by extension, a constitutional violation.

Plaintiff only cites *Eaglesmith v. Ray*, No. 2:11-CV-00098 JAM-JFM, 2011 WL 4738338 (E.D. Cal. Oct. 6, 2011), in which the district court denied qualified immunity because "a reasonable school official would have known that it is a constitutional violation to treat the employees he or she supervises differently on the basis of race." *Id.* at *9. However, while Plaintiff alleges only that the individual Defendants withheld information from him, the *Eaglesmith* plaintiff alleged "Defendants interfered with his coaching, ostracized him, questioned his spiritual beliefs, referred to him in derogatory terms in front of his colleagues, gave him an 'unsatisfactory' performance evaluation, and refused to rehire him as a basketball coach." *Id.* at *1. Furthermore, *Eaglesmith* alone is insufficient to show clearly established law in the Ninth Circuit. *See Martinez*, 91 F.4th at 1031 ("The case law also must be controlling—from the Ninth Circuit or the Supreme Court—or otherwise be embraced by a consensus of courts outside the relevant jurisdiction." (cleaned up)).

So, even if Plaintiff's allegations plausibly alleged an Equal Protection claim, the individual Defendants would be entitled to qualified immunity on the claim.[1]

## II.   STATE LAW CLAIMS AGAINST TUHSD

### A.   FEHA Discrimination and Failure to Prevent Discrimination Claims

California Government Code § 12940 prohibits an employer from discriminating against a person "in compensation or in terms, conditions, or privileges of employment" because of their race. Cal. Gov't Code § 12940(a). Like a Title VII or Equal Protection claim, a section 12940(a)

---

[1] Defendant also argues Plaintiff's federal claims against Superintendent Taupier are especially attenuated. Because Plaintiff has not alleged an affirmative act or adverse employment action by either Principal Clissold or Superintendent Taupier, the Court need not consider whether the specific allegations related to Superintendent Taupier are sufficient.

14

claim requires an "adverse employment action," meaning an action which "materially affect[s] the terms and conditions of employment." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1035-36, 1049 (2005). Plaintiff's FEHA discrimination claim fails for the same reason his Equal Protection claim fails; he has not alleged facts to show Defendants took adverse employment action against him.

As to Plaintiff's failure to prevent discrimination claim, "[a] plaintiff seeking to recover . . . must show that (1) he was subjected to discrimination; (2) defendant failed to take all reasonable steps to prevent discrimination; and (3) this failure caused plaintiff to suffer injury, damage, loss or harm." *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 804 (N.D. Cal. 2015) (citation omitted). Given the first requirement, "[n]o liability can arise for failing to take necessary steps to prevent discrimination [] except where discriminatory conduct actually took place and was not prevented." *Id.* ("[A] failure to prevent discrimination claim is 'essentially derivative of a discrimination claim.'") (citing *Trujilo v. N. Cnty. Transit Dist.*, 63 Cal. App. 4th 280, 289 (1998)). So, Plaintiff's failure to prevent discrimination claim fails absent a plausible discrimination claim.

However, Defendant's argument Plaintiff fails to state a FEHA claim because the Family Educational Rights and Privacy Act ("FERPA"), 34 C.F.R. § 99.1, et seq., limited TUHSD's ability to share information about the video is unavailing. While FERPA may be relevant to TUHSD's defenses, it does not affect whether Plaintiff has stated a prima facie claim of discrimination under FEHA.

So, the Court dismisses the FEHA claims for discrimination and failure to prevent discrimination with leave to amend.

### B.     Fraudulent Concealment

To plead fraudulent concealment, a plaintiff must allege, among other things, the defendant had a duty to disclose the allegedly concealed facts to the plaintiff. *See Kaldenbach v. Mutual of Omaha Life Ins., Co.*, 178 Cal. App. 4th 830, 850 (2009). In addition, under California law, "[e]xcept as otherwise provided by statute . . . [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other

15

person." Cal. Gov. Code § 815(a). Therefore, "direct tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care, and not on [ ] general tort provisions[.]" *Eastburn v. Reg'l Fire Prot. Auth.*, 31 Cal. 4th 1175 (2003). The statute need not "provide on its face that it is applicable to public entities;" instead, it is sufficient "if the statue defines the tort in general terms." *See Rodriguez v. Inglewood Unified Sch. Dist.*, 186 Cal. App. 3d 707, 716 (1996) (cleaned up).

Plaintiff alleges TUHSD "had a duty to disclose certain facts and intentionally failed to disclose those facts," which was a "substantial factor in causing [Plaintiff's] harm." (Dkt. No. 20 ¶¶ 141, 151.) However, "to state a cause of action every fact essential to the existence of statutory liability must be pleaded with particularity, including the existence of a statutory duty." *Searcy v. Hemet Unified Sch. Dist.*, 177 Cal. App. 3d 793, 802 (1986). "Duty cannot be alleged simply by stating 'defendant had a duty under the law'; that is a conclusion of law, not an allegation of fact." *Id.* "Since the duty of a governmental agency can only be created by statute or 'enactment,' the statute or 'enactment' claimed to establish the duty must at the very least be identified." *Id.* Therefore, Plaintiff fails to state a claim for fraudulent concealment because his amended complaint does not specify a statutory duty imposing liability on TUHSD.

Plaintiff's opposition brief cites several statutes which may impose a duty of care. First, Plaintiff cites the California Occupational Safety and Health Act ("Cal/OSHA"). *See* Cal. Lab. Code §§ 6400-01 ("Every employer shall furnish employment and a place of employment that is safe and healthful for the employees therein."). Cal/OSHA may impose a duty of care in at least negligence actions against private third parties. *See Elsner v. Uveges*, 34 Cal. 4th 915, 924 (2004). However, even if CalOSHA allows a negligence claim against TUHSD, Plaintiff does not explain how it would allow for a fraudulent concealment claim. *See Rodriguez*, 186 Cal. App. 3d at 716 (requiring statue which "defines the tort in general terms"). Second, Plaintiff does not allege TUHSD, through alleged fraudulent concealment, breached a duty to "establish, implement, and maintain an effective workplace violence prevention plan." *See* Cal. Lab. Code § 6401.9(c)(1). Third, Plaintiff does not explain how California Education Code § 220's prohibition on racial discrimination on the basis of race "in any program or activity conducted by an educational

16

institution," imposes a duty on TUHSD owed to Plaintiff, as opposed to students. *See C.N. v. Wolf*, 410 F. Supp. 2d 894, 903-04 (C.D. Cal. 2025) (finding student had private right of action under Cal. Educ. Code § 220).

So, because Plaintiff's amended complaint does not allege a statute created a specific duty of care owed by TUHSD to Plaintiff for the alleged fraudulent concealment, the Court dismisses Plaintiff's fraudulent concealment claim.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' motion to dismiss all Plaintiff's claims. However, as this Order is the first time the Court has addressed his claims against the individual defendants, and as Plaintiff may still be able to state federal claims against individual Defendants such that individual Defendants are not entitled to qualified immunity, the Court grants Plaintiff leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) ("[A] district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts."). Plaintiff may not add additional claims or defendants without further leave of Court. The deadline to file a second amended complaint is **January 17, 2026**. If Plaintiff elects not to file an amended complaint by that date, the Court will enter judgment in Defendants' favor on all federal claims, and dismiss the state law claims without prejudice to being pursued to state court.

This Order disposes of Docket No. 30.

**IT IS SO ORDERED.**

Dated: December 12, 2025

JACQUELINE SCOTT CORLEY
United States District Judge